UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | 3:11-cr-00048-RLY-WGH-1 |
| | ) | |
| KENNETH SCHMITT, | ) | |
|     Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION TO SUPPRESS**

Defendant, Kenneth Schmitt, is charged with one count of unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Schmitt filed a motion to suppress the evidence of the firearm. On February 11, 2013, the court held an evidentiary hearing with respect to that motion, wherein the court heard the testimony of Schmitt and Evansville Police Department ("EPD") Officers Chris Goergen and Craig Pierce. The court, having read and reviewed the parties' submissions and the applicable law, and having heard the testimony of the witnesses noted above, now **DENIES** the motion.

**I.     Background**

On December 20, 2010, a confidential informant alerted Officer Goergen – an officer with approximately ten years of experience with the EPD -- that Schmitt possessed an AR-15, an assault rifle, at 26 East Maryland, Evansville, Indiana ("Residence"). Based on this information, Officer Goergen further investigated and discovered that Schmitt had an outstanding felony warrant for maintaining a common

1

nuisance; however, the address on the warrant did not match the Residence given by the confidential informant.

Because of the discrepancy in addresses, Officer Goergen set up surveillance on the Residence. Around noon on December 21, 2010, Officer Goergen set up a team of three or four officers to conduct surveillance of the home in order to determine whether Schmitt was indeed at the Residence. Around 2:00 p.m., officers observed a car pull up to the Residence and three individuals enter the home. Officer Goergen, positioned approximately two blocks from the Residence, observed Schmitt answer the front door, but he did not see Schmitt move beyond the door's entrance. This is the only time the officers observed Schmitt during their surveillance. Approximately fifteen to twenty minutes later, all three visitors left the house.

After recognizing Schmitt, Officer Goergen left the scene to apply for and obtain a search warrant for the Residence. This search warrant only covered Schmitt's person. Officer Goergen testified that although EPD could have arrested Schmitt upon seeing him, in an abundance of caution they decided to get a search warrant as officers were not familiar with the layout of the Residence. Before executing the warrant, the supervisor of the Evansville Special Weapons and Tactics team ("SWAT") determined that SWAT presence was necessary based on several factors, including Schmitt's criminal history[1].

---

[1] According to the Government's Response, Schmitt's criminal record included arrests for Resisting Law Enforcement, Pointing a Firearm, Battery by Means of a Deadly Weapon, and Criminal Confinement. These arrests were not discussed in detail at the hearing other than testimony that Schmitt had a criminal history that included violence and weapons.

Officer Goergen briefed the SWAT team, including Officer Pierce, on the investigation. Officer Pierce has over eight years of experience with the EPD, with six years on the SWAT team. Officer Pierce became aware of the investigation on the same day as the search, as he had neither seen nor known of Schmitt before that time. At the briefing, Officer Pierce heard all of the information collected from the surveillance; learned of the threat level of Schmitt; reviewed a picture of Schmitt; and discussed the Residence. According to Officer Pierce, the briefing confirmed that at least two persons were inside the house, but it did not include a layout of the inside of the house. The goal of the sweep was to serve the search warrant on Schmitt.

Officer Pierce estimated that at 4:30 p.m., the SWAT team used a "flashbang" through the front bay window, and ten to fifteen members forced their way through the front door. Officer Pierce's duties on the team were the "break and rake," so he entered the home after several others and then "fell back in." According to Officer Pierce, because a flashbang emits a loud and scary sound, it is common for individuals to "drop to the ground" out of fear following its use, and not as a sign of surrender. Consistent with Officer Pierce's experience, there was an unidentified male, later confirmed to be Schmitt, on the ground in the front room immediately after the flashbang entered the Residence. Schmitt was handcuffed soon thereafter. The record does not identify who apprehended Schmitt, but the evidence reflects that it was neither Officer Pierce nor Officer Goergen.

Another individual, Jason Wyatt, was also in the house at the time of the search, but Wyatt was not arrested. EPD observed Wyatt enter the Residence approximately

3

twenty minutes prior to the SWAT team's entry. Testimony did not establish where and when Wyatt was located by the SWAT team.

Meanwhile, other officers were attempting to "clear the house" and "make sure there were no threats." According to Officer Pierce, this search was done for the officers' safety, as multiple officers are assigned to clear the place. The duration of this search was a "very short amount of time" and took less than five minutes. During this limited search, Officer Pierce went down into the basement because, in his experience, people could hide there. Neither Officer Pierce nor Officer Goergen could recall whether the door to the basement was locked, closed, or out-swinging.

Schmitt testified that the basement door is an out-swinging door, meaning it opens toward the person entering. Further, Schmitt stated the door was locked shut with a hook and eye lock when the police entered. Schmitt testified that he knew the door was locked shut because the door always remained closed due to heating concerns and the occasional presence of children. On the other side of the door, as Schmitt testified, was a dark stairwell leading to the basement.

Once in the basement, Officer Pierce saw an assault rifle in plain view. Officer Pierce stood next to the gun, notified others of his discovery, and remained next to it until relieved by a narcotics detective. In addition, other officers discovered narcotics in plain view in other rooms in the Residence. After seeing the narcotics, Officer Goergen applied for and received a second search warrant for narcotics and firearms. The initial and subsequent search produced a variety of controlled substances -- including THC,

pills, and methamphetamine – as well as plastic bags, a digital scale, ammunition, and the above-referenced assault rifle.

## II. Discussion

Schmitt moves to suppress the assault rifle seized in the basement as the fruit of an illegal search. The Government opposes the motion. The Government principally contends that the search constituted a constitutional protective sweep and, even if the search were in error, it was harmless.

### A. Protective Sweep

The Fourth Amendment of the Constitution of the United States protects the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. A search without a warrant is per se unreasonable and a violation of the Fourth Amendment unless the search falls within a specifically established exception. *United States v. DiModica*, 468 F.3d 495, 499 (7th Cir. 2006). Indeed, "[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Bleavins v. Bartels*, 422 F.3d 445, 450 (7th Cir. 2005). One of those exceptions, and the one at issue here, is a protective sweep, first discussed in *Maryland v. Buie*, 494 U.S. 325 (1990).

Under the protective sweep exception, officers may, incident to arrest and "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. A search beyond this immediate area is only justified

5

when there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id*. A protective sweep is a "quick and limited search of premises" that is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* at 327. The search, therefore, should last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36. The justification for such a search is that "[l]aw enforcement officers have an interest in ensuring their safety when they lawfully enter a house to effect an arrest. That interest justifies their ensuring that the dwelling does not harbor another person who is dangerous and who unexpectedly could launch an attack." *United States v. Burrows*, 48 F.3d 1011, 1015 (7th Cir. 1995).

  The inquiry into whether a search qualifies as a protective sweep is "a very fact-specific one" and should be "assessed carefully in light of the overarching policy concerns articulated in *Buie*." *Id*. at 1016. These facts should be "assessed from the perspective of the officer on the scene" as it is the "reasonableness of the officer's judgment at the time he was required to act that counts." *Id*. Factors the court should evaluate include the "particular configuration of the dwelling, characteristics of those known to be present and who might be present," and the "general surroundings, especially its history in previous law enforcement efforts." *Id*.

  Here, the circumstances surrounding the arrest would reasonably make officers concerned about their safety. First, the EPD entered the Residence to serve a search

warrant for Schmitt's person. Although Schmitt's felony arrest warrant did not concern a violent crime – maintaining a common nuisance – police had been alerted by a confidential informant that Schmitt possessed an assault rifle at the home. Though the informant's credibility had not been sufficiently evaluated at that point, the informant's tip on where Schmitt was located had been corroborated. Next, as Officers Pierce and Goergen testified, Schmitt had a criminal history involving violence and weapons. This is evident from the decision to include SWAT presence based on such factors. Finally, during the EPD's approximate 4-hour surveillance, officers observed multiple individuals entering and exiting the Residence, along with one male who did not exit the house -- Wyatt. Though this is not a high volume of visitors in a 4-hour span, it is significant enough that it would be reasonable for officers to believe other individuals may be present in the home besides Schmitt and Wyatt. Moreover, Wyatt's presence in the home would force SWAT to be cognizant of his location during the search, especially given the possibility of an assault rifle in the home. Based on these factors, sufficient articulable facts existed to conduct a protective sweep.

Schmitt nevertheless contends that EPD's surveillance assured them that only Schmitt and Wyatt were in the home; thus, a protective search was unnecessary once these individuals were located because the search warrant had been completed. First, testimony did not establish the timing of when Schmitt and Wyatt were apprehended relative to when Officer Pierce entered the basement. But even assuming Schmitt and Wyatt were in custody prior to Officer Pierce entering the basement, it was still uncertain at that point whether additional individuals were in the Residence. Indeed, multiple

visitors entered the house in the short period of surveillance, and it is possible other individuals were in the home prior to EPD's surveillance. As Officer Pierce testified, he only knew a white male had gone to the ground after the flashbang, but he neither knew that man was Schmitt nor understood him to be surrendering. Even more, the possibility of a dangerous assault weapon in the home escalates the importance of determining whether anyone else is present. Accordingly, EPD's surveillance did not prevent them from assuming additional individuals may be present in the home.

Similarly, Schmitt's "had their man" theory fails. Even though the SWAT team did locate Schmitt upon entering the home, they were not obligated to immediately withdraw from the home. "[O]fficers [have] the right to ensure their safety and the safety of everyone else in that area not only during the arrest itself but also during the remainder of the time that they were legally on the premises and its environs." *Burrows*, 48 F.3d at 1017; *see also Buie*, 494 U.S. at 334 (stating "the arresting officers are permitted . . . to take reasonable steps to ensure their safety *after*, and while making, the arrest") (emphasis added). This is because an "unknown assailant who attacks officers departing from an arrestee's home poses an equivalent, if not greater, risk to the safety of officers and others as does the assailant who attacks the officers upon entry." *Burrows*, 48 F.3d at 1017, n. 9; *see also United States v. Robinson*, 775 F. Supp. 231, 234-35 (N.D. Ill. 1991) ("Law enforcement officers, however, are not required when making an arrest inside a building to surreptitiously back out of that building, guns drawn and pointed in all directions"). Accordingly, EPD was justified in conducting a protective sweep even if Schmitt had already been placed in custody.

8

Next, Schmitt contends the search exceeded its scope because it included a basement where uncontradicted evidence shows that the out-swinging basement door had been locked from the outside, and thus, it was not reasonable for police to believe that someone was hiding there. He further claims a person locked in the basement from the outside could pose no threat to law enforcement.

This argument is unconvincing for several reasons. First, the presence of a locked door does not enter the matrix when determining the constitutionality of a protective sweep. The officer's safety is the focal point of that analysis, not the condition of the door. *See Burrows*, 48 F.3d at 1017 (finding protective sweep permissible where officers were required to "force four locked doors" because the search was done to ensure the officer's safety and took no more than five minutes to complete). Indeed, there are many ways an individual behind a locked door could harm officers on the scene, including kicking down the door or firing a weapon through the closed door, which is even more at issue here with the possibility of an assault weapon on the premises. In fact, officers may face greater danger from behind locked doors than unlocked doors, so this fact alone does not change the analysis.

Also, even if officers could have simply remained at the basement door to prevent an individual from exiting, that does not alter the legality of the search. As the Seventh Circuit noted, "[w]here . . . police have good grounds to believe that potentially dangerous individuals could be in the basement, a protective sweep into that area is reasonable regardless of whether there might be a 'less intrusive investigatory technique' for securing that area." *U.S. v. Tapia*, 610 F.3d 505, 511 (7th Cir. 2010) (citation

9

omitted). As a result, the hook and eye latch on the basement door has no bearing on the constitutionality of the protective sweep.

Finally, Schmitt implies that EPD had not only the ability, but a duty to arrest Schmitt immediately upon discovering his presence at the Residence instead of applying for an additional search warrant. The court will not take the radical position to either fault police for following additional due process protections or second-guess the safety measures police took in executing an arrest warrant. Accordingly, the court will not delve into any ulterior motives for this behavior and finds the argument unpersuasive.

Given the above facts, the officers had sufficient articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that other rooms throughout the house posed a danger to those on the arrest scene. Accordingly, the court finds the protective sweep of the Residence, including the basement, was constitutional.[2]

### B. Harmless Error

In the alternative, the Government argues that even if the search were in error, the error is harmless as narcotics were found in plain view and this resulted in a search warrant which would have ultimately discovered the assault rifle. The court agrees. The police unquestionably were lawfully in the apartment and observed various narcotics in plain view. Based upon the items observed in plain view, Officer Goergen applied for

---

[2] The Government also argued that the discovery of the assault rifle occurred in the course of performing the initial search warrant for Schmitt's person. Because the search was constitutional under the protective sweep framework, it is not necessary for the court to reach that issue.

and received a second search warrant for the Residence. Inevitably, the search of the basement for narcotics would have led to the discovery of the assault rifle. *See United States v. Tejada*, 524 F.3d 809, 813 (7th Cir. 2008) (finding discovery of cocaine would have been inevitable where police were lawfully in apartment, saw in plain view a travel bag that they knew contained cocaine, and "[t]here [was not] even the shadow of a doubt" that a search warrant would have been issued to search the bag). Thus, even if the search were in error, the assault rifle should not be suppressed.

### C. Conclusion

For the reasons set forth above, Schmitt's motion to suppress (Docket #36) is **DENIED**.

**SO ORDERED** this 5th day of March 2013.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.